# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CAUSE NO: 2:07 CR 132 |
| ) | |
| DOZIER T. ALLEN, JR., WANDA ) | |
| JOSHUA, and ANN MARIE KARRAS. ) | |

## OPINION AND ORDER

Defendants Dozier Allen, Wanda Joshua and Ann Marie Karras were convicted by a jury of two counts of mail fraud for defrauding Calumet Township and its citizens of over $140,000 and of the right to honest services owed by Defendants as Calumet Township officials. Defendants contend that the evidence presented at trial was insufficient to establish that the United States mails were used to commit the fraud. They have therefore moved for judgment of acquittal. (DE 132.) Because there was sufficient circumstantial evidence that the mails were used in furtherance of the scheme to defraud, the motion is denied.

## I. BACKGROUND

The Defendants were charged with participating in a mail fraud scheme that took place between January 2000 and December 2002. During that time, Allen served as the elected Trustee of Calumet Township; Joshua served as Chief Deputy Trustee; and Karras was the Deputy Trustee of Finance. The Trustee's Office is responsible for distributing welfare payments and other assistance to poor citizens of the Township. All three individuals were paid employees of the Township, whose salaries were reviewed and approved by the Township's three-member Board.

In February 2000, the Calumet Township Trustee's Office, with Allen at the helm, entered into a contract with Workforce Development Services (WDS). WDS is a nonprofit agency that

provides employment and training services for residents of Northwest Indiana. Its administrative offices are located in Gary, Indiana – three blocks away from the Calumet Township Trustee's Office. The WDS contract required the Trustee's Office to submit monthly reports to WDS specifying the amount of non-federal dollars that the Trustee's Office had expended on welfare-to-work services. WDS found this information valuable because it would help them increase their federal funding. As a result, WDS was willing to pay the Trustee's Office a healthy sum of money for the information. Through December 2002, the Trustee's Office billed and received $170,000 related to the WDS contract.

But instead of having the money go the Trustee's Office, Allen, Joshua, and Karras paid it to themselves. (A fourth defendant whose case was severed and who later pled guilty also received some of the money.) They paid themselves $145,000 of this money, even though none of them did any additional work beyond their normal Township duties to perform the WDS contract. None of these individuals disclosed these payments or obtained Township Board approval as they were required to under the Indiana conflicts of interest law. Ind. Code § 35-44-1-3. According to the government's theory – which the jury accepted – this was both a scheme to defraud the Trustee's Office of money and of the intangible right to honest services of these public officials.

As in any mail fraud prosecution, the government had to prove that the United States Mails were used in furtherance of the scheme. 18 U.S.C. § 1341. The mailings that were alleged in this case were two of the checks ostensibly mailed from WDS to the Trustee's Office pursuant to the contract described above. The defendants do not argue that these checks were not in furtherance of the scheme. Instead, they argue that there was insufficient evidence that they were transmitted through the mails. Count One alleges that WDS issued and mailed a reimbursement

2

check under the contract to the Calumet Trustee's Office on or around November 27, 2002; Count Two alleges a similar check was mailed from WDS to the Trustee's Office on or around December 19, 2002.

Here's what the evidence showed on the issue of whether the checks were mailed: the Government submitted the two envelopes used to actually transmit the checks described in Counts One and Two of the indictment. Government Exhibit 5 (Count 1 of the indictment) and Exhibit 6 (Count 2) were envelopes addressed from WDS to the Calumet Township Trustee with postage meter marks dated "Nov 27 '02" and "Dec 19 '02," respectively. Exhibit 5 has a partially legible stamp that indicates the envelope was received by Calumet Township. It also contains the handwritten marking "12/4/02/ak." The Government contends that "ak" refers to Defendant Ann Karras. Exhibit 6 has a stamp indicating the envelope was received by the Township's Office on December 20, 2002 at 1:51 p.m. It also contains the handwritten marking "Rec'd 12.20.02."

Angela Lewis, the WDS employee who processed the reimbursement payments to the Trustee's Office under the contract testified as to how the reimbursement checks were transmitted from WDS to the Trustee's Office:

> Q: How did Calumet Township receive the checks?
> A: Usually through the mails or someone picked them up.
> Q: If they were mailed, tell us the process?
> A: The process is to stuff the envelope and then run the envelope through our postage meter.
> Q: And then what would happen?
> A: Then they would be physically taken to the post office.
> \* \* \*
> Q: Did you -- did WDS have a postage meter?
> A: Yes.

3

> Q: Is that how things were mailed out at WDS?
>
> A: Yes.
>
> Q: Was that a regular business practice?
>
> A: Yes.
>
> * * *
>
> Q: All right. Who did the mailing?
>
> A: [Another] employee.
>
> Q: Okay. So, you personally didn't mail the check either?
>
> A: No.
>
> Q: Did you --
>
> A: It was actually taken to the post office by the other employee.
>
> Q: Before it was taken to the post office, did it get run through a postage meter?
>
> A: Yes, it did.

(DE 105 at 29, 31-32; DE 106 at 13.) Lewis further stated unequivocally that Exhibit 6 was "mailed out." (DE 105 at 37.) On cross examination Lewis admitted that although both envelopes were run through the U.S. postage meter at WDS, neither envelope had any markings attributable to the U.S. Postal Service on them. (DE 106 at 15.) In other words, the defense contended at trial (and now) that since the postage was not cancelled, the envelopes were probably not mailed.

This issue must have surprised the government because the prosecutors made a motion to add a witness to its witness list during trial, Postal Inspector Mark Shaw. Over objection by the defense, I allowed Shaw to testify about the mail processing practices at the Gary, Indiana postal facility. Shaw explained why it was possible that Government's Exhibits 5 and 6 were sent through the mail without any markings by the Postal Service. Mail at the Gary facility is separated and processed differently depending on the type of mail, how postage was paid, the size of the envelope, the location of the addressee, whether the information is typed or handwritten, etc. (DE 131 at 9-11, 14.) The purpose of a postmark is to cancel the stamp so it cannot be

reused again. (*Id.* at 14.) Metered mail – like the envelopes presented in this case – is prepaid and dated and thus poses no risk of being reused. (*Id.* at 14-16.) Therefore, as Shaw explained, metered mail can skip the postage cancellation process altogether. (*Id.* at 16.) In addition to a postmarking, some postal processing machines spray bar codes on the front of a mailing or an ID tag on the back of a mailing. (*Id.* at 14.) The envelopes presented in this case – referred to as "flats" in postal lingo – had a greater height dimension than a letter-sized envelope and therefore had to be processed in a particular machine. (*Id.* at 11.) The machines that sorted flats at the Gary facility in 2002 did not spray bar codes or ID tags onto the mailings. (*Id.* at 18.) Therefore, even if they were processed through automated machines, they would not have had any such marking.

Though Shaw was able to provide several explanations for the absence of a postal marking, he was unable to confirm one way or another just by looking at the envelopes whether Government Exhibits 5 and 6 had actually been mailed. On cross-examination, he testified:

> Q: So, the bottom line is simply by you as an experienced postal inspector looking at those two Government's Exhibit 5 and 6, you can't tell us whether it did or did not go through the mail. Is that a fair statement?
> A: Based on the lack of markings on this piece, I would say you are correct.
> Q: Right. It might have -- it's not impossible for it to have gone through the mail?
> A: Correct.
> Q: But it's not impossible for it to not have gone through the mail?
> A: Correct.
> Q: Those exhibits, even with your experience, don't tell us one way or another, is that correct?
> A: I would say you -- no one would be able to mutually exclude one possibility or the other.

(*Id.* at 21.)

At the close of the Government's case-in-chief, Defendants orally moved for a judgment of acquittal, arguing that there was insufficient evidence for the jury to convict on the issue of mailing. Pursuant to Federal Rule of Criminal Procedure 29(b), I reserved decision on the motion pending the jury verdict. On April 8, 2009, the jury found all three Defendants guilty on both counts of mail fraud. The Defendants subsequently filed renewed motions for judgment of acquittal.

## II. DISCUSSION

Federal Rule of Criminal Procedure 29 requires the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." However, "a defendant's burden in showing the evidence was insufficient to support a conviction is nearly insurmountable." *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008). A jury's guilty verdict will be set aside "only if the record contains *no evidence,* regardless of how it is weighed, from which a jury could have found the defendant was guilty." *Id.* (emphasis added). Put another way, the evidence must be "so scant that a jury could only speculate as to the defendant's guilt, and a reasonably minded jury must have had a reasonable doubt as to the defendant's guilt." *United States v. Howard*, 179 F.3d 539, 542 (7th Cir. 1999). In reviewing a motion for judgment of acquittal, I must view the evidence in the light most favorable to the Government. *Rollins*, 544 F.3d at 835. It is not my job to play thirteenth juror, re-weigh the evidence myself, or second-guess the jury's assessment of the evidence. *Id.*

In order to prove that a defendant committed mail fraud, the government must show that the defendant used the U.S. mails in furtherance of the scheme to defraud. 18 U.S.C. § 1341; *see also United States v. Szarwack*, 168 F.3d 993, 995 (7th Cir. 1999). The government can establish the use of mails either by direct evidence or circumstantial evidence. *United States v. Brooks*,

748 F.2d 1199, 1202 (7th Cir. 1984). "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009).

The Government contends that the envelopes presented in this case are direct evidence of mailing. It is true that the introduction of the envelope in which the correspondence was mailed may constitute strong direct evidence of the use of mails. *Brooks*, 748 F.2d at 1202–03. But the testimony of Gary Postal Inspector Mark Shaw establishes unequivocally that, without any postal markings, one cannot tell just by looking at the envelopes whether they had been mailed. Therefore, the envelopes in this case cannot be considered direct evidence of mailing. However, Angela Lewis's statement that Government Exhibit 6 "was mailed out" is direct evidence that the U.S. mails were used in furtherance of the second count of mail fraud. This is because one need only believe that statement without drawing any additional inferences to conclude that Exhibit 6 was in fact mailed. *See Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006).

Setting aside for the moment Lewis's conclusory statement that Exhibit 6 "was mailed out," this is really a case of circumstantial evidence as it relates to the mailing requirement. To be sure, circumstantial evidence, such as testimony regarding an office's mailing practices, may be sufficient to prove the mailing element of mail fraud "so long as the circumstances proven directly support the inference [of mailing] and exclude all reasonable doubt to the extent of overcoming the presumption of innocence." *Brooks*, 748 F.2d at 1202–03. For example, evidence that certain documents are mailed in the ordinary course of business is generally sufficient to show that mailing occurred in a particular instance. *See United States v. Ratliff-White*, 493 F.3d 812, 817-18 (7th Cir. 2007); *United States v. Alexander*, 135 F.3d 470, 474-75

(7th Cir. 1998). But if there is evidence that the mailing party deviated from its customary practice, then the government can no longer rely solely on standard business practices to make its case. *See id.* This does not mean that the government must prove that the office practice is invariable or disprove every conceivable alternative theory as to how a specific correspondence was transmitted. *United States v. Keplinger*, 776 F.2d 678, 691 (7th Cir. 1985); *see also United States v. Delfino*, 510 F.3d 468, 472 (4th Cir. 2007); *United States v. Hannigan*, 27 F.3d 890, 892-93 (3d Cir. 1994); *United States v. Shyres*, 898 F.2d 647, 655 (8th Cir. 1990).

Defendants rely heavily on two Seventh Circuit cases – *Brooks* and *United States v. Swinson*, 993 F.2d 1299 (7th Cir. 1993) – to make their case that the evidence of mailing practices was lacking here. In *Brooks*, the defendant was convicted of two counts of mail fraud for submitting a false theft claim to his car insurance company and for submitting a false stolen vehicle report to the auto theft bureau. *Brooks*, 748 F.2d at 1201–02. The government relied solely on the testimony of the documents' recipients to prove mailing. *Id.* at 1203. On the first count, an insurance claims examiner testified that she knew the claims form was sent through the mail because she saw that the form had been date-stamped by the claims department. *Id.* But on cross-examination, the examiner admitted that the department stamped correspondence "received" from both the U.S. mails and private delivery agencies; so there was no way to tell if the form had been mailed just by looking at the date stamp. *Id.* Similarly, the theft bureau manager testified that he knew the stolen vehicle report was sent through the mail – even though he never saw the return envelope – because that was the way such forms were normally sent. *Id.* At best, these individuals' testimonies proved a probability that the mails had been used, which is not enough to overcome the burden of proof beyond a reasonable doubt. *Id.* at 1204. Therefore, the Seventh Circuit reversed the convictions on both counts.

8

In *Swinson*, the defendant defrauded his employer by creating a dummy business and billing his employer for phantom goods and services. *Swinson*, 993 F.2d at 1300. The defendant was indicted on seventeen counts of mail fraud: the first sixteen counts were checks issued by the company to defendant's dummy business; the seventeenth count alleged the mailing of a fraudulent purchase order. *Id.* Another employee testified that the defendant personally picked up one of the sixteen checks, but he wasn't sure which check it was. *Id.* Since the Government couldn't prove which check wasn't mailed, rather than permitting the jury to speculate, the district court dismissed all the counts relating to the checks – counts one through sixteen. *Id.* The judge allowed the seventeenth count (the purchase order) to go to the jury, which returned a guilty verdict. *Id.* But the evidence was shaky on that count too. At trial, the government established that it was the company's usual business practice to mail a copy of purchase orders to the vendor. *Id.* at 1302. However, for that particular purchase order, the defendant waited in the office where the purchase order was being completed, handled the purchase order himself and later picked up the check. *Id.* at 1302-03. Since the company deviated from its usual practice on that specific occasion, the evidence could not support an inference that the usual mailing practices were followed. *Id.* Accordingly, the conviction on count seventeen was reversed. *Id.* at 1303.

This case is significantly different from *Brooks* and *Swinson*. WDS employee Angela Lewis testified that there were two alternative methods by which WDS transmitted reimbursement checks to the Calumet Trustee's Office: they were "usually" mailed but occasionally someone from the Trustee's Office picked them up. (DE 105 at 29.) Lewis then described the process that WDS would use for delivering checks to the Trustee's Office when the mailing option was being employed. Lewis testified that *when the checks were mailed* – i.e. when they were not being picked up – WDS followed these procedures: the checks were placed in an

9

envelope, the envelope was then run through a postage meter, and the metered envelopes were then physically taken to the post office. (DE 105 at 29.) And at least as it relates to Government Exhibit 6 (the mailing for Count 2), she further stated without equivocation that the process was followed and it was in fact mailed. (DE 105 at 36.)

The Government didn't just rely on the testimony of Ms. Lewis about WDS's business practice of sending envelopes through the U.S. mails once they were run through the postage meter. In addition, the Government submitted the actual envelopes in which Counts One and Two of the indictment were based. Consistent with Lewis' testimony, both of these envelopes were in fact metered, meaning the postage had already been paid. Postal Inspector Shaw explained that because the checks were sent in prepaid flats within the same zip code, there were several reasons why these particular envelopes could have been mailed without receiving any stamps or markings from the post office. What's more, the markings on the envelopes themselves were strong proof that the envelopes were sent through mails. Those markings showed that there was a time delay between when the envelopes were metered and when they were stamped received by WDS. For Count One (Exhibit 5) the time delay was seven days (the Thanksgiving holiday fell in between); for Count Two (Exhibit 6) the time delay was one day. Although the Trustee's Office's stamping practices were never explained at trial, the stamps themselves and the time delay is strong circumstantial evidence of mailing. Finally, as discussed above, Lewis testified that Exhibit 6 was in fact mailed. Taken together, a reasonable juror could infer that the envelopes were mailed in accordance with the office's mailing practice, as opposed to having been picked up.

Defendants counter that there was no testimony regarding the Trustee's Office's mail receiving practices, what the stamps and handwritten markings on the envelopes meant, and

10

whether the Trustee's Office stamped both mail and non-mail correspondence like the insurance company did in *Brooks*. But the recipient's business practices is irrelevant in this case because, unlike *Brooks*, there was testimony of the *sender's* mailing practices along with several pieces of circumstantial evidence showing that the mailing practices had been followed.

Nothing in *Swinson* mandates a judgment of acquittal. In *Swinson*, the evidence established that there was a departure from the ordinary method with respect to one of the sixteen checks that had been issued – it was picked up as opposed to mailed. Therefore, it was impossible for a jury to determine conclusively that any of the checks had been mailed. As for the purchase order, the government could not rely on the company's ordinary mailing practices because the evidence showed that the company did not follow its mailing practice *on that specific occasion*.

In this case, there is simply no concrete evidence that WDS departed from its procedures for mailing the two relevant checks to the Calumet Trustee's Office. As Lewis testified, if they were mailed "the process is to stuff the envelope and then run the envelope through our postage meter . . . [and] then they would be physically taken to the post office." (DE 105 at 29.) Since the two envelopes in question were in fact metered, the business practice would have been to mail them out. There is no evidence that WDS strayed from its business practice in this case, and there is strong evidence to the contrary.

Defendants argue that the Government didn't rule out the possibility that someone intercepted the envelopes after they were metered but before they were delivered to the post office. They also take issue with the fact that the Government offered no evidence regarding what procedures WDS followed when the Trustee's Office picked up the checks. But "[t]he fact that the government's evidence might also be consistent with an alternate theory is irrelevant; the

11

law does not require the government to *disprove* every conceivable hypothesis of innocence in order to sustain a conviction on an indictment proved beyond reasonable doubt." *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir. 1991) (emphasis in original). Is it possible that WDS metered these envelopes but didn't mail them? I suppose, but that strikes me as unlikely. Why waste the postage? Perhaps the envelopes were metered and then someone from the Trustee's Office happened to be at WDS and hand-delivered them back to the Trustee's Office instead of having them mailed. But it was the jury's responsibility to decide whether that was a likely enough possibility to create a reasonable doubt. To be sure, the defense lawyers in this case drove the point home during cross-examination and in closing argument. But the jury decided that it wasn't a likely enough scenario to create a reasonable doubt. Without any concrete evidence that routine mailing practices were not followed – like there was in *Swinson* – I will not second-guess the jury's assessment of the evidence or find the verdict unreasonable.

A case in the Eleventh Circuit illustrates why the mailing evidence is sufficient in this case. In *United States v. Waymer*, 55 F.3d 564 (11th Cir. 1995), an Atlanta Board of Education member was convicted of 22 counts of mail fraud for improperly receiving proceeds from a contract between the school system and a pest control company. *Id.* at 566-67. Each count was a check issued from the school system to the company. *Id.* at 570. School personnel testified that it was the school system's customary practice to mail vendor checks to the vendors the day after the checks were cut. *Id.* However, the pest control company often picked up its checks and, because it was a small company with limited funds, would deposit the checks right away. *Id.* at 570-71. The school had no way of knowing which checks were mailed and which were picked up, but estimated as many as 50% were picked up. *Id.* at 570. The evidence also showed that each of the twenty-two checks at issue were deposited at least four days after they were cut. *Id.* at 571. Four

12

days' time delay is consistent with an ordinary degree of postal efficiency. *See id.* (citing *United States v. Moody*, 903 F.2d 321, 332 (5th Cir. 1990)). Therefore, even though the checks were picked up as often as they were mailed, the Court held that the timing evidence, the school's mailing practices, and the company's check depositing practices were together sufficient to establish that these checks had been mailed. *Id.* at 571.

The *Waymer* case demonstrates that the government can meet its burden of proof on the issue of mailing, even when there are two methods of delivering the correspondence at issue, so long as the circumstantial evidence is sufficient to support a finding that the mails were utilized. Like *Waymer*, the circumstances established in this case – i.e., Lewis's and Shaw's testimony, the metered envelopes and the time delay – are more than enough to sustain the jury's finding that the reimbursement checks were mailed. Therefore, the Defendants' Joint Motion for Acquittal [DE 132] is **DENIED**.

**SO ORDERED.**

Dated: August 6, 2009.

                                                s/ Philip P. Simon
                                               PHILIP P. SIMON, JUDGE
                                               UNITED STATES DISTRICT COURT